# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-0833V
(to be published)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| WARREN LATHAN, | * | Chief Special Master Corcoran |
| | * | |
| Petitioner, | * | Filed: February 28, 2023 |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

*Steven K. Jambois*, Kralovec, Jambois and Schwartz, Chicago, IL, for Petitioner.

*Nina Ren*, U.S. Department of Justice, Washington, DC, for Respondent.

### ORDER VACATING RULING ON ENTITLEMENT[1]

On June 5, 2019, Warren Lathan filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged that he developed Guillain-Barré syndrome ("GBS") as a result of the influenza ("flu") vaccine he received on September 8, 2017. Petition (ECF No. 1) ("Pet.") at 1.

---

[1] This Decision will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the published Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the entire Decision will be available to the public in its current form. *Id*.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

1

This case was initiated on June 5, 2019, and assigned to the Special Processing Unit (the "SPU"), since it appeared to allege a Table claim. Pet. at 1. A year later, Respondent filed a Rule 4(c) Report on June 15, 2020 (ECF No. 20) conceding entitlement—and leading me to rule that Petitioner was entitled to compensation. Ruling, dated June 17, 2020 (ECF No. 21) ("Ruling"). For the next 18 months, the parties remained mired in damages resolution, with numerous records filed to substantiate the appropriate amount of damages to be paid. ECF Nos. 32–47.

In the fall of 2021, however, Respondent requested the opportunity to amend his Rule 4(c) Report, noting that a complete review of the updated records now suggested Petitioner could *not* meet the Table requirements of a flu-GBS claim, because his actual injury was chronic inflammatory demyelinating polyneuropathy ("CIDP"). ECF No. 56 at 1. Respondent thereafter filed an amended Rule 4(c) Report on December 16, 2021, and in it, requested I vacate my earlier ruling on entitlement. ECF No. 58. The matter was then reassigned out of SPU to my regular docket on June 21, 2022, and on July 13, 2022, I ordered Respondent to file a brief addressing whether he was estopped from "undoing" his claim concession. He did so (ECF No. 60) ("Resp."), and Petitioner filed his on brief on October 10, 2022 (ECF No. 61) ("Opp.").

I.      **Factual Background Summary**

Petitioner received the flu vaccine on September 8, 2017. Ex. 2 at 19. Ten days later (September 18, 2017), he sought emergency room care, complaining of abdominal pain, lower back pain, and disequilibrium that began the previous day. Ex. 3 at 7. He also noted feeling a tingling sensation in his fingers and toes as well as feeling unsteady on his feet. *Id*.

Upon examination, Petitioner's vital signs and overall strength were normal, and his laboratory results were mostly unremarkable, however, he was admitted for further evaluation. Ex. 3 at 10. During a subsequent neurological evaluation, he displayed absent deep tendon reflexes and reduced muscle strength. *Id*. at 34. He later underwent a brain CT which indicated a small vessel ischemic disease—the impression being a "concern for GBS." *Id*. And nerve conduction testing was consistent with that initial diagnosis. *Id*. at 42.

Petitioner began plasma exchange therapy, with intravenous immunoglobulin ("IVIG") therapy to follow. Ex. 3 at 169. He thereafter began to display some improvement, and after his hospital discharge, he engaged in physical therapy. *Id*. at 19–20; Ex. 4 at 133, 174, 200. During the fall of 2017, he was medicated for neuropathic pain, but saw additional improvement throughout this timeframe and into the winter of 2018. Ex. 2 at 48–49; Ex. 4 at 38–39, 174. By the summer of 2018, however, he was reporting a tightness and swelling sensation in his feet and a buzzing that ascended to his knees with extension, along with some difficulty ambulating. Ex. 2 at 87. At that time, he exhibited reduced strength, weak or absent reflexes, and reduced sensation in his hands. *Id*.

The fall of 2018 (now a year after initial onset) saw Petitioner continue to experience many neuropathic symptoms despite his general improvement. Ex. 7 at 2141, 2149, 2177. But by the summer of 2019, Petitioner reported worsening pain, and was deemed by a neurologist to have experienced a health decline, neurologically-speaking. Ex. 7 at 1908, 1939. A follow-up electromyographic study revealed abnormal results largely consistent with what initial testing had shown. *Id.* at 1429. The worsening of symptoms led Petitioner to seek emergency care that October. *Id.* at 1170–80. Petitioner was now readmitted to the hospital—but with a differential diagnosis of "possible CIDP [or] new demyelination versus recrudescence of prior nerve injury." *Id.* at 1189–90. CIDP was included as a diagnostic explanation based on his progression of ongoing symptoms. *Id.* at 1190, 1200.

Petitioner was still experiencing comparable symptoms into 2020, and CIDP remained in his differential diagnosis. Ex. 7 at 901, 923–25. By June 2020, CIDP became his formal diagnosis, and it was confirmed after another round of electromyographic testing. Ex. 7 at 629–32, 775.

## II.     Parties' Arguments

Respondent argues that it would constitute an abuse of discretion if he were "estopped" from amending his position (and effectively revoking his concession) based on what record evidence reveal about the actual nature of Petitioner's injury. Resp. at 14. Indeed, he questions whether an estoppel framing of the present dispute is correct, noting that none of the estoppel doctrines (*i.e.*, collateral estoppel, res judicata, and judicial estoppel) are applicable because they all require a final judgment on the merits of the claim, but the Ruling was not such a determination. *Id.*

Here, Petitioner submitted highly probative evidence not provided to Respondent before the concession which revealed that he could not meet the requirements for a flu-GBS Table Injury. Resp. at 15. Rather the updated medical records filed by Petitioner in an effort to establish damages showed that he had received a "definite" diagnosis of CIDP, as the above factual summary demonstrates. *Id.*; Ex. 7 at 629–32. Thus, the confirmed CIDP diagnosis makes it impossible for Petitioner to satisfy the Table requirements of his claim, since a CIDP diagnosis is a defined exclusionary factor. Resp. at 16; 42 C.F.R. § 100.3(c)(15)(vi).

Respondent also contends that vacatur of the Ruling would not be prejudicial to Petitioner (even though the parties spent more than eighteen months attempting to resolve damages). Resp. at 16. Any delay associated with reopening the entitlement inquiry is in part *attributable* to Petitioner, in Respondent's view. Program claimants are "obliged to produce all relevant documents, including 'all post-injury inpatient and outpatient records (including all provider notes, test results, and medication records).'" *Id.*; 42 U.S.C. § 300aa–11(c)(2). But even after Respondent had requested updated medical records for the purpose of evaluating damages, Petitioner did not supplement the record until approximately ten months after the filing of the Rule 4(c) Report, or by April 20, 2021. At that time, Petitioner filed nearly 4,000 pages of additional medical records

3

documenting testing and treatment he received after July 19, 2018 (and it was only after that date that the CIDP diagnosis was embraced).³ Resp. at 17. Finally, Respondent argues that preventing him from amending his position would be unfair, and would incentivize petitioners to withhold information in a desire to encourage concessions based on incomplete records. *Id*. at 18.

Petitioner argues in reaction that he would be unfairly prejudiced if I were to find that reopening the record is warranted. Opp. at 2. He maintains that at the time his Statement of Completion was filed on August 28, 2019, it was his understanding that all the medical records had been provided in accordance with what was requested and what was received in return. *See* Statement of Completion, dated Aug. 28, 2019 (ECF No. 11). Moreover, Petitioner stresses that every attempt was made on his behalf to file all medical records and that in no way were they deliberately withheld as to interfere with Respondent's review of the case. *Id*. at 2–3. Accordingly, it is Petitioner's position that Respondent be estopped from amending his position, and that the case should proceed with damages. *Id*. at 3.

## ANALYSIS

Special masters have broad discretion in conducting proceedings, including deciding whether, when, and how to take and consider evidence in resolving a petitioner's entitlement to damages. *See Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 400 (1997) (concluding that it was within the special master's discretion to determine whether to allow in new evidence after an evidentiary hearing in the case); Section 12(d)(3)(B) (special master afforded discretion when making determinations regarding admission of evidence). Inherent to the exercise of this discretion is the propriety of reopening a matter for the purpose of evaluating additional relevant and dispositive information. Indeed, the Vaccine Rules compel special masters to consider "all relevant and reliable evidence," in order to ensure fundamental fairness of proceedings to both parties. Vaccine Rule 8(b)(1) ("[i]n receiving evidence, the special master will not be bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence governed by principles of fundamental fairness to both parties"). Thus, it is understood in the Program that even fully-resolved claims may be subject to reopening in the appropriate circumstances.

The context of seeking to reopen an otherwise-"closed" record has some relevance to my analysis in this case. Leniency is counseled when resolving a request to allow new evidence into the record just before, or even during, an evidentiary hearing. *Tembenis v. Sec'y of Health & Hum. Servs.*, No. 03-2820V, 2010 WL 1508646, at *2–6 (Fed. Cl. Spec. Mstr. Mar. 29, 2019). Case law does not, however, address whether leniency is still appropriate in the final stages of a proceeding

---

³ Between June 5, 2019, and August 28, 2019, Petitioner filed five sets of medical records in support of his diagnosis, and which tracked his overall treatment and improvement, but only included documents originally dated through July 2019. *See generally* Exs. 1–4, 6. I note, however, that it appears that by the summer of 2019, at least the possibility of CIDP had been raised in Petitioner's treatment—and thus Respondent's summer 2020 concession could have taken such evidence into account.

(such as after a hearing), when the record is essentially closed (or should be, especially in an old matter). Such circumstances can be analogized to a request to reopen proceedings to permit the introduction of newly-discovered evidence, and requests in such circumstances have been granted. *See, e.g.*, *Kaminski v. Sec'y of Health & Hum. Servs.*, 39 Fed. Cl. 253, 255, and 258 (1997) (special master erred in denying Respondent's motion to reopen proceedings where Respondent discovered that fact witness possessed relevant information after hearing's conclusion, and where timeliness of request to reopen was not questioned). Even lengthy time lapses between the close of evidentiary proceedings and a subsequent request to reopen the record have been overlooked where the newly-discovered evidence was deemed sufficiently important. *Vant Erve v. Sec'y of Health & Hum. Servs.*, 39 Fed. Cl. 607 (1997) (special master's refusal to reopen a question of liability was an abuse of discretion even though three years had passed since decision; information offered by Respondent was highly probative, there was no showing of prejudice to Petitioners, and Respondent was not at fault for the delay), *aff'd after remand*, 232 F.3d 914 (Fed. Cir. 2000) (unpublished table decision).

In *Vant Erve*, the Court of Federal Claims recognized four factors that should be considered when determining whether it is appropriate to reopen the record on entitlement to consider subsequently-filed evidence. *Vant Erve*, 39 Fed. Cl. at 612 (*cited with approval*, 232 F.3d at 914). Those four factors are: (1) the nature of the proffered new evidence; (2) the prejudice to the parties; (3) the length of the delay; and (4) the reason for the delay. *Id*. at 612. Each factor should not be afforded equal weight however, because "[t]he paramount test is the nature of the proffered new evidence," meaning "the extent to which the new evidence is both relevant and affective of the outcome." *Vant Erve*, 232 F.3d at 612. Where the evidence "is of marginal relevance and impact, the burden on the moving party increase dramatically with respect to the influence of the remaining factors," with the opposite as the case where the evidence is "highly relevant and clearly outcome determinative." *Vant Erve*, 39 Fed. Cl. at 612 (citing *Horner v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 23, 27 (1996) (fundamental fairness requires admission of highly probative evidence of vaccine record) and *Kaminski v. Sec'y of Health & Hum. Servs.*, 39 Fed. Cl. 253, 258–59 (1997) (error in special master's refusal to reopen entitlement proceedings to hear probative, relevant testimony)).

In this case, and as Respondent notes, the *Vant Erve* factors arguably need not be applied at all. Although my Ruling was intended to *lead* to a final determination (and was based on Respondent's clear concession of entitlement) it is not *itself* a final determination in the case—and therefore could properly be vacated or modified depending upon circumstance. *Plavin v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 609, 622 (1998) (finding that the special master acted well within her discretion in reopening entitlement proceedings to consider new evidence after she had decided the issue of entitlement but before a final judgment had been entered).

However, *Vant Erve* does provide helpful guidelines for how to view Respondent's request. In particular, the "new" evidence (and it is only new in that it was mostly filed after the Ruling and Respondent's concession) completely undermines the determination that Petitioner had met

5

the standards for a flu-GBS Table claim. And this has been deemed the paramount consideration as well, since the records establishing that Petitioner was ultimately diagnosed with CIDP are "highly relevant and clearly outcome determinative." *Vant Erve*, 39 Fed. Cl. at 612. To permit the Ruling to stand would be to make a factually-erroneous entitlement finding—and knowingly so.

The other *Vant Erve* factors weigh less in Respondent's favor, but do not overcome the more persuasive reasons for vacatur. For example, the two-year delay in Respondent's request to undo the Ruling is fairly excessive. But Petitioner has advanced no specific objections to delay beyond the *per se* inconvenience of being made to wait for a final determination in this case. While I fully agree that Program cases should not languish in damages for extended periods of time, Petitioner's slowness in providing the documents deemed necessary to finalize damages contributed greatly to the delay. In fact, and as Respondent contends, Petitioner's CIDP diagnosis was fleshed out by his treaters in the summer and fall of 2019—*after this case was initiated*. Had medical records overall been filed more promptly during the claim's course, it might have been better established by the contemporaneous record that a flu-GBS Table claim was not tenable.

I also note that Respondent's concession was, at a minimum, premature—and did cause Petitioner to incur some reliance costs. As a result of my determination, I am likely to be required to dismiss Petitioner's Table claim entirely (although a causation-in-fact claim that the flu vaccination caused Petitioner's CIDP will be permitted to go forward). It is expected that in future cases involving a GBS diagnosis (which can often be mistaken by treaters for CIDP at the outset), Respondent will adopt a more conservative approach, and demand that claimants establish no evidence of a change in diagnosis for subsequent treatment before conceding. While it may be appropriate based upon this record to undo my Ruling, the unfairness of the result is mostly attributable to Respondent's haste.

## CONCLUSION

For all the reasons discussed above, I hereby **VACATE** my Ruling on Entitlement. The parties shall contact chambers to set a status conference so that next steps in the matter can be discussed. Any questions regarding this order may be directed to my law clerk, Madison Atkinson, at (202) 357-6391.

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master